Thank you, Your Honors. My name is David Ness. I'm with the Federal Defender's Office in Great Falls, Montana, and I represent the petitioners in this case, Annabelle Brown and Dewey Coleman. I would like to reserve three minutes for rebuttal, please. As the Court's aware from reading the briefs, Mr. Brown and Mr. Coleman were sentenced to the Montana State Prison sometime in the 1970s. I think they both got there in the mid-1970s. At the time that they were incarcerated, Montana had a state statute indicating that the legislature directed the executive branch of the government to adopt rules providing for good time for any prison work. That language within the statute had been in existence, although with some minor word changings, from 1972 on through 1982, which is kind of the salient date in this case. The question is, is whether or not that language created a liberty interest that would require the State to provide good time credits for work and other sorts of programming. Or to make rules. Or to make rules. And that's – if I can – and maybe that just kind of gets to the meat of the argument here. The statute does indicate that the executive branch, in this case the Department of Corrections, shall adopt rules regulating the provision of good time credits. I think it's fairly implied, and I think that it comes – that it comes almost as a mandatory conclusion that if the executive branch is ordered to adopt rules to provide for good time credits for work, then the legislature necessarily directed the Department of Corrections to, in fact, give that good time. The – Well, be that as it may, the real question here is whether or not there's a Federal law requirement that rules be made. Not particular, but that rules be made. And so – That's the question under Lemage and Habeas Corpus jurisdiction, right? Irrespective of how you construe what the legislation requires. Our question is whether or not, as a matter of Federal law, there was a constitutional right for rules to be made before 1982. Your Honor, with all due respect, I don't think I would phrase the issue in those terms. I would phrase the issue, I think, in whether or not the statute actually provided for good time credits for inmates incarcerated prior to 1982 who had been working. And that, I think, is the question here. And what I would state is that not only because of the type of interest involved, that is an interest in having the sentence shortened by complying with prison regulations, but also because of the mandatory language of the statute in which it said shall, that it did, in fact, create that right to good time credits for prisoners engaged in any work. And that's the way the statute addressed it. What discretion did the State – I mean, let's assume that the State had a right. Did they have any discretion at all in the kind of rule, the nature of the rule that they had done? I think, yes, I do. Within the limit provided by the legislation. Was it sufficiently clear what they were entitled to? What they would have been entitled to. The specific time. The specific time. The statute does indicate, depending upon the person's custody level, that they're not entitled to, say, no more than 10 days per month, 13 days per month, 15 days per month. So in that sense, I think that there was at least a specific time limitation placed on the amount of time they can get. But, no, Your Honor, I would have to agree that insofar how the prison actually would have implemented those regulations, that was unknown because the Department of Corrections never did promulgate any regulations. Well, as Judge Rieber pointed out, the statute itself doesn't really specify the nature or the extent of the good time that was to be allowed to them. It doesn't, except with the upper time limit. Don't you need those regulations in combination with the statute to have the kind of liberty interest that's recognized by Stanton? I don't think the regulations in and of themselves are a required prerequisite for the liberty interest to arise. I think the liberty interest arises through the wording of the statute. Now, the Department of Corrections did not promulgate any actual rules saying that if you engage in this type of work, we'll give you three days, this type of work, five days, this sort of thing. But what they did do is they said if you're in, say, maximum security, you only get ten days per month, and that's all you're going to get. So it would seem to me that looking at the statute, which I think is what we need to do, that prisoners such as Mr. Brown and Mr. Coleman should be entitled to, depending upon their classification, at least the upper limit. Well, certainly no more than the upper limit contained in the statute. By the way, do we have jurisdiction over Mr. Coleman's appeal? And why is that?  I think you do, Judge. I could look at the notice of appeal again, but as I recall, at least the title of the case included his name, and his case was intertwined with Mr. Brown's. If no one else has any further questions, I'll wait until rebuttal time. All right. Thank you. May it please the Court. My name is Diana Cook. I represent the State of Montana Department of Corrections in this case. I believe there are three reasons, Your Honors, why Judge Nelson was correct in the court below, why Judge Nelson correctly decided that the Montana Supreme Court was correct when they said that Mr. Coleman and Mr. Brown do not have a due process liberty interest in good time rules. There is, of course, a liberty interest in good time, but that does not translate wholesale to an award for good time rules. And I believe, Your Honor, that this Court does not have jurisdiction over Mr. Coleman for two reasons. Number one is the question that you brought up, Your Honor, about whether he had signed the notice. But the other reason is because Mr. Coleman could not possibly earn any good time for work reform before 1982 because he held no job in the prison. I don't believe he has standing, therefore, in this suit. So I believe that the only person that we're talking about is Mr. Brown. And as this Court pointed out with Mr. Ness, even if the Montana Department of Corrections were ordered to promulgate rules at this time, we don't know what those rules would say. We don't know if those rules would give Mr. Brown any good time for the prison employment that he had before 1982. That's why this is not an appropriate case for habeas corpus, because there is no proof that Mr. Brown would get out of prison sooner or get out of prison because of the release, because of these good time rules that the Department could possibly adopt. Montana Supreme Court has taken somewhat of a different position with this statute over the years. What do you understand in light of Remington? I guess it's Remington, the most recent pronouncement for the Montana Supreme Court. Is it Remington or Orozco? I can't remember which. Orozco, Your Honor, is the most recent pronouncement. Remington was the first one. Does that have anything to do with pre-1982? Your Honor, I don't believe it does. I think that the examination, the analysis would still be the same under Orozco or under Remington. The only thing that changed with Orozco was the court said, okay, in light of Sandin v. Connor, we have to find out now if there's an interest of substantial merit that would result in a liberty interest, rather than just looking at the language to see if it had the mandatory predicates and the substantive. The question I have as to why that statement you just made doesn't apply to this case, because in this case, Brown v. Meisner, the Montana Supreme Court relied on Remington, right? Correct. But in Orozco, they recognized that Remington was no longer good law in light of Sandin, right? But Sandin was decided before Brown v. Meisner was decided. So, you know, wasn't the State supreme court clearly wrong in relying on, you know, Remington in light of the fact that Sandin had already been decided? Your Honor, I think that the analysis would have still been the same if it was decided under Orozco or under Remington. And you're correct that Sandin v. Connor had been decided, but I don't believe it was briefed by the parties. The only thing that the court did in Orozco was to say that in light of Sandin v. Connor in the Ninth Circuit case, Gotcher v. Wood, it's clear that Remington must be overruled insofar as it applied the analysis of the mandatory language substantive predicate. That's all it did, was say we're not going to rely on that. We're going to go back to what Sandin v. Connor said. We have to look at, is this a right of substantial merit, substantial interest? And they don't have a substantial interest in rules. So I don't think that the analysis would change one bit. And we do have just a question. Was the language of the statute that the court dealt with in Remington essentially the same as the language pre-1982? It was, Your Honor. It was exactly the same thing. And what the Petitioners have done in this case is to grab one little sentence out of the statute. And that sentence has been in the statutes from 1917 until the statute was repealed in 1995. But the statute in Orozco was different, right? Your Honor, I don't believe the statute was different in Orozco. I believe it was the same statute. It was one general sentence that said that the prison will promulgate rules for any work or activity. But then it was always qualified. It was qualified by so many days per classification, so many days per pint of blood back in 1917. Didn't the legislature pass at one point a statute specifically dealing with educational programs? Your Honor, the ---- If you shall get good time credit for participating in an educational program. It was for work. It was for prison industries, and it was in 1982. And the Montana Supreme Court said that was the only statute that mandated, let alone allowed, the Department of Corrections to grant good time for work. And that's the way that the Supreme Court has always interpreted the statute. They've interpreted the statute as mandating the categories and the specific things in the statute rather than the one general sentence. And that's been something that they have done since. So the term in the statute in existence in 19 ---- prior to 1982, when it makes reference to any work, I really had no meaning without the regulation. Is that the State's position? That is the State's position. And that is the way that the Montana Supreme Court has interpreted that. Because every time they've had that statute in front of them, Remington is an instance, exactly the same statute. And Remington said, I should get credit for doing these correspondence courses. And the Supreme Court completely ignored that general line, that general sentence that said you shall have good time for any work or activity. And they interpreted, though, the specifics. And that they have done consistently. And Judge Nelson, in his wise opinion in the court below, said that that's the way that the Montana Supreme Court has interpreted it. And that is in line and not contradictory to established United States Supreme Court precedent, Sandin v. Conner and Wolf v. McDonnell. And that is why his opinion was correct and why he said that the Montana court was correct. And he gave proper deference to the Montana court to interpret Montana law. And according to the Anti-Terrorism and Effective Death Penalty Act, that was correct. Okay. Thank you very much, Ms. Cook. Thank you. Can I move on? Your Honor, just a couple of points. Judge Tashima, you brought up the chronology of the State cases in relation to the United States Supreme Court's decision in Sandin. And that was something that I had noticed, too. And it's interesting that the Brown case had been submitted on briefs, according to the opinion, on August 3rd of 1995, and it was decided about a month later in September of 1995. The Sandin case was decided and published on June 19th of 1995. The Sandin case had been out there. It had been decided almost three months prior to the Brown case. Now, when you look at the Brown case, the Brown case relies specifically upon Remington, which, of course, relied on pre-case law preceding Sandin. And, in fact, they actually go into their analysis looking at the mandatory language and things of that nature. As I recall from the Montana Supreme Court's case in Orozco, looking at the same statute, they found that, in fact, there was a liberty interest. They went on to dismiss the plaintiff's damages based upon a notion of qualified immunity, indicating, of course, that the prison officials had a right to rely upon the decisions that predated Sandin because they were in effect at that time. So I think that the Supreme Court's reliance on Remington was erroneous, is clearly erroneous. And I think that in the second portion of that opinion, where they ‑‑ Breyer. Brown. Brown. I'm sorry, yeah. In the second part of the opinion in Brown, when they go through their analysis to determine whether or not there's a liberty interest, because they relied on this erroneous case law, I think that necessarily their decision, their analysis was incorrect. Kagan. Under ‑‑ I think you had an argument that we should not apply AED, the Anti-Terrorist Infected Death Penalty Act. That standard review didn't apply. But it does, doesn't it? It probably does, yes. And don't we apply the law? Don't we look to the State Court's decision with respect to the United States Supreme Court precedent that was in existence at that time? Yes. To determine whether or not it's contrary to the Supreme Court decision, whether or not under the same sort of facts they came to a different ‑‑ At the time of the Montana Supreme Court decision in this case, Sandin had not yet been decided. It had been decided. It had been decided about three months earlier. Okay. Although the State Supreme Court didn't cite it, right? Apparently was not aware of it. But the Sandin case? I would assume not. The case was never found in the opinion. The other thing I would point out very quickly is the opposing counsel indicated that in 1982 there had, for the first time, been enacted a provision allowing for ‑‑ allowing prisoners to obtain good time for educational purposes. I disagree with that. The first time educational purposes was added as a criteria for good times in 1967, when section 105 was amended to allow for good time credits for blood drawing and for educational credits. In 1982, what happened was that they specifically granted good time credits for persons participating in the prison industries program, which I think is completely different than simply working at a janitorial job or something to that effect. Let me ask you this. This is an habeas proceeding. How do we know how much time or the brown sentence would actually be? I don't know. I don't think that that's ever really been adequately decided down in the courts below. Their cases were always dismissed on the basis of these, I don't know, you might call them procedural reasons, and they never really got to the meat of the question, which would be assuming they do have a liberty interest, how much time did they get? Somewhat speculative or attenuated, isn't it? We don't really know. We're not proceeding with habeas. This is a habeas. The explanation is that he's being wrongfully detained. Because it's good time credits for an erroneously given sentence. But that's something that I think could be determined. I don't think it's been satisfactorily determined in the courts below at this point, but assuming this Court would reverse command, I think that that could be analyzed and that could be figured out. Thank you. OK. Thank you. We thank both counsel. This case is now submitted for a decision.
judges: Reavley , Tashima, Paez